## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No:

**KAREN NELSON,**
    Plaintiff,

v.

**KAISER PERMANENTE,**
    Defendant.

___

## COMPLAINT
___

    Karen Nelson, by and through her undersigned attorney, hereby files this Complaint against the above-named defendant.

## PARTIES

1.    Karen Nelson ("Nelson") is an individual and a resident of Colorado

2.    Kaiser ("Kaiser") is a nation-wide health plan, comprising multiple organizations including Kaiser Foundation Hospitals, Kaiser Foundation Health Plans, and Permanente Groups, with headquarters in Oakland, California, and doing business in multiple locations in Colorado.

## JURISDICTION

3.    The purpose of this action is to redress and restrain acts or practices by Defendants which federal law deems unlawful.

4.    The Court has original jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. §§451, 1331, 1337, and 1343. This action is authorized and instituted pursuant Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §2000e,

*et seq.*, the Civil Rights Act of 1866, as amended, 42 U.S.C. §1981, and the retaliation prohibitions of the False Claims Act (FCA), 31 U.S.C. §3730(h).

5. Defendant is an employer as that term is defined in the relevant statutes.

6. Venue for this action properly lies in the District of Colorado pursuant to 28 U.S.C. §1391(b).

## NATURE OF THIS ACTION

7. This case arises out of the actions of Defendants in subjecting Ms. Nelson to (i) discrimination based upon her race and national origin (Jamaican), including but not limited to harassment and a hostile work environment, and retaliation for her opposition to discrimination in violation of Title VII, 42 U.S.C. §2000 *et seq.*, (ii) wrongful termination in violation of public policy; and (iii) retaliation for reporting and attempting to stop false claims, in violation of the False Claims Act, 31 U.S.C. §3730(h).

## FACTUAL ALLEGATIONS

*Background*

8. Ms. Nelson is a black female of Jamaican heritage.

9. Ms. Nelson started work with Kaiser in September of 2010, as a Nurse Manager for Primary Care at the Rock Creek Medical Offices.

10. Ms. Nelson moved to Perinatal Hospital and Home Care Services ("PHHC") in December of 2011, as a Nurse Manager, supervising nurse practitioners and support staff.

11. Ms. Nelson's job required her to be accountable for creating a culture of commitment, innovation, compliance, ethics and integrity, which necessitated her managing nurses and signing off on their time and attendance reports and expense reports.

12. In PHHC, Ms. Nelson was supervised by Lisa Bland, Senior Manager, who in turn reported to Beth Martin, Senior Director.

13. When Ms. Nelson began her new job in PHHC, staff had numerous complaints about the management abilities of Lisa Bland, and morale was very low.

*Ms. Nelson Reported Fraud by Kaiser Employees*

14. While carrying out her responsibilities to sign off on attendance and expense records, Ms. Nelson found serious and on-going fraud, for example:

 a. Several nurse practitioners consistently billed for hours they had not worked, as demonstrated in a comparison of time sheets with records of days off;

 b. Some nurse practitioners consistently claimed billable mileage that was not driven, for example, when they were off, or for miles not actually driven;

 c. In fact, one nurse practitioner worked out an arrangement with her supervisor, Lisa Bland, to reduce miles between her home and work (miles not reimbursed), so as to increase miles driven to clinics or homes (miles that were reimbursed) by claiming her child's daycare as her "home."

 d. Some nurse practitioners regularly claimed reimbursement for fax machines and/or internet services in amounts clearly larger than their bills indicated, for example, claiming $50 a month for internet services when their bills showed that they actually paid $35.

15. Because nurse practitioners are considered to be "providers," on-going and regular fraud, although relatively small in individual instances, amounts to larger monies being billed to patients, and to the government for Kaiser Medicaid patients, in violation of laws

prohibiting fraud in Medicaid programs, the False Claims Act and others, as well as a violation of Kaiser policy, which states that fraud, waste and abuse, including falsification of expense reimbursement claims and time records, constitute serious offenses that may warrant immediate termination.

16. In January of 2012, Ms. Nelson brought to Ms. Bland's attention expense and time reports that contained serious irregularities; in response, Ms. Bland instructed Ms. Nelson to sign off on the reports despite the fraudulent entries, instructing her to ignore irregularities under $1,000, and telling Ms. Nelson that she "was not asking [her] to kill young babies."

17. It was Ms. Nelson's understanding that she was to sign off on fraudulent time and expense reports or lose her job; in fact, Ms. Bland told her that Ms. Bland could sign off on the fraudulent reports herself, in which case, she "would not need" Ms. Nelson.

18. After being rebuffed by Ms. Bland, Ms. Nelson took her concerns about fraud to Beth Martin, Senior Director, who also refused to take action.

18. Ms. Nelson finally took her concerns about fraud to Kaiser's Compliance Department in April of 2012, showing the officials there specific documentary proof of wrongdoing. No action was taken by the Compliance Department to remedy the on-going fraud.

*Retaliation for Reporting Fraud*

19. Prior to Ms. Nelson refusing to sign off on fraudulent reports and reporting fraud, no Kaiser official had brought any performance problems to Ms. Nelson's attention; and, in fact, in March of 2012, Kaiser gave Ms. Nelson a performance bonus of over $7,000.

20. On February 6, 2012, shortly after Ms. Nelson refused to sign off on fraudulent financial reports, Ms. Bland brought Ms. Nelson into her office and gave her an unwarranted

corrective action document, a document that had not been preceded by any verbal discussions or written warnings; nor was it followed by any corrective action plan.

21. The lack of any rational basis for the corrective action was clearly evidenced by the fact that Ms. Bland retracted the corrective action on February 9, 2012, and, in its place, Ms. Bland gave Ms. Nelson what she called an orientation or goal plan.

22. In March and April of 2012, Ms. Bland and Martin attempted to impose unfounded and ridiculous discipline on Ms. Nelson for "acting outside of her scope of practice" when Nelson told a nurse practitioner under her supervision to "follow her instincts," even though Ms. Nelson's job description specifically required her, as an RN and nurse manager, to supervise, lead, role model, coach, counsel, train, and motivate personnel.

23. Because Ms. Bland had allowed on-going fraudulent activity with regard to time and expense reports, Ms. Nelson's insistence on ethical behavior "alienated" staff, as demonstrated in a document prepared by Ms. Bland, entitled "Documenting Karen's Behavior," which criticizes Ms. Nelson for: (i) "[d]ouble checking every line item on expense report," and (ii) "TPCs required to document their time on a spreadsheet," and which also notes that staff has been "[a]lienated over expense report." Ms. Nelson can produce that document.

24. In June of 2012, Ms. Bland did a mid-year review of Ms. Nelson, a review not normally done for other similarly-situated employees, in which Ms. Bland found numerous alleged problems with Ms. Nelson's work, despite the fact that Ms. Nelson had met every goal listed in the orientation/goal document given to Nelson in February by Bland, generally ahead of time. Instead of incorporating objective work performance in the evaluation, Ms. Bland based

her criticisms on the complaints of the same staff who had been alienated by Ms. Nelson's changes in reporting requirements.

25. When Ms. Nelson refused to sign the mid-year review, Ms. Bland ordered Ms. Nelson out of the workplace; only to apologize and invite Ms. Nelson back the same day.

26. In August of 2012, Kaiser officials notified Ms. Nelson that her job was being eliminated so that Ms. Bland could be returned as the nurse manager and as the person reviewing time and expense reports.

27. Even after Ms. Nelson's termination was announced, Kaiser treated her differently and less advantageously than similarly situated employees who had not complained, for example:

    a. Ms. Nelson applied for three other positions after being notified of her impending termination, but before the actual termination, all of which she was qualified for.

    b. Under Kaiser policy, transitional employee candidates are to be hired over other equally-qualified internal or external candidates and managers not following this policy must demonstrate in writing that another candidate "clearly possesses superior qualifications or experience."

    c. Kaiser denied Ms. Nelson all positions for which she applied, (i) affirmatively cancelling another nurse manager position for which Ms. Nelson applied; and (ii) refusing to even interview her for the other two positions.

    d. There is no indication that managers hiring for the three positions for which Ms. Nelson applied demonstrated in writing that another candidate "clearly possesses superior qualifications or experience."

*Kaiser Discriminated Against Ms. Nelson on the Basis of Race and/or National Origin*

28. When Ms. Nelson transferred to the Perinatal Health Homecare and Hospital Services ("PHHC") in December of 2011, she was the only person of color in an otherwise totally Caucasian workplace.

29. In PHHC, Ms. Nelson was supervised by Lisa Bland, Senior Manager, who in turn reported to Beth Martin, Senior Director, both of whom are Caucasian.

30. While in PHHC, Ms. Nelson was treated differently than other non-Jamaican employees, for example:

    a. Prior to Ms. Nelson transferring to PHHC in December of 2011, no Kaiser official had brought any performance problems to Ms. Nelson's attention; and, in fact, in March of 2012, Kaiser gave Ms. Nelson a performance bonus of over $7,000.

    b. In the beginning of February of 2012, Ms. Bland brought Ms. Nelson into her office and gave her an unwarranted corrective action document, a document that had not been preceded by any verbal discussions or written warnings; nor was it followed by any corrective action plan.

    c. The lack of any rational basis for the corrective action was clearly evidenced by the fact that Ms. Bland retracted the corrective action on February 9, 2012, and, in its place, Ms. Bland gave Ms. Nelson what she called an orientation or goal plan.

    d. In March and April of 2012, Ms. Bland and Martin attempted to impose unfounded and ridiculous discipline on Ms. Nelson for "acting outside of her scope of practice" when Nelson told a nurse practitioner under her supervision to "follow her instincts," even

though Ms. Nelson's job description specifically required her, as an RN and nurse manager, to supervise, lead, role model, coach, counsel, train, and motivate personnel.

   e. Because Ms. Bland had allowed on-going fraudulent activity with regard to time and expense reports, Ms. Nelson's insistence on ethical behavior "alienated" staff, as demonstrated in a document prepared by Ms. Bland, entitled "Documenting Karen's Behavior," which criticizes Ms. Nelson for: (i) "[d]ouble checking every line item on expense report," and (ii) "TPCs required to document their time on a spreadsheet," and which also notes that staff has been "[a]lienated over expense report." Ms. Nelson can produce that document.

   f. In June of 2012, Ms. Bland did a mid-year review of Ms. Nelson, a review not normally done for other similarly-situated employees, in which Ms. Bland found numerous alleged problems with Ms. Nelson's work, despite the fact that Ms. Nelson had met every goal listed in the orientation/goal document given to Nelson in February by Bland, generally ahead of time. Instead of incorporating objective work performance in the evaluation, Ms. Bland based her criticisms on the complaints of the same staff who had been alienated by Ms. Nelson's changes in reporting requirements.

   g. When Ms. Nelson refused to sign the mid-year review, Ms. Bland ordered Ms. Nelson out of the workplace; only to apologize and invite Ms. Nelson back the same day.

  31. In August of 2012, Kaiser officials notified Ms. Nelson that her job was being eliminated so that Ms. Bland could be returned as the nurse manager and as the person reviewing time and expense reports.

  32. Even after the lay-off was announced, Kaiser treated Ms. Nelson differently and less advantageously than similarly-situated non-Jamaican employees, for example:

      a.     Ms. Nelson applied for three other positions after being notified of her impending termination, but before the actual termination, all of which she was qualified for.

      b.     Under Kaiser policy, transitional employee candidates are to be hired over other equally-qualified internal or external candidates and managers not following this policy must demonstrate in writing that another candidate "clearly possesses superior qualifications or experience."

      c.     Kaiser denied Ms. Nelson all positions for which she applied, (i) Kaiser affirmatively cancelled another nurse manager position for which Ms. Nelson applied; (ii) Kaiser interviewed two white candidates for the Director, Quality Resources Manager, position for which Ms. Nelson applied, interviewing no candidates of color, and, when a white applicant declined Kaiser's offer of employment for this position, Kaiser refused to hire anyone else, and (iii) the third position for which Ms. Nelson applied, Director of Employee Health/Wellness Services, was given to a white candidate, Kaiser again refusing to even interview the two black candidates.

      d.     There is no indication that managers hiring for the three positions for which Ms. Nelson applied demonstrated in writing that another candidate "clearly possesses superior qualifications or experience," as required by Kaiser rules.

*Kaiser Retaliated Against Ms. Nelson for Opposing Discrimination*

33. Ms. Nelson reported the discrimination she was suffering to Robin Sadler, the Vice President of Human Resources, on February 21, 2012.

34. After she reported discrimination against her, Ms. Nelson was treated differently than employees who had not opposed discrimination, for example:

  a. Prior to Ms. Nelson reporting discrimination against her, no Kaiser official had brought any performance problems to Ms. Nelson's attention; and, in fact, in March of 2012, Kaiser gave Ms. Nelson a performance bonus of over $7,000.

  b. In the beginning of February of 2012, Ms. Bland brought Ms. Nelson into her office and gave her an unwarranted corrective action document, a document that had not been preceded by any verbal discussions or written warnings; nor was it followed by any corrective action plan.

  c. The lack of any rational basis for the corrective action was clearly evidenced by the fact that Ms. Bland retracted the corrective action on February 9, 2012, and, in its place, Ms. Bland gave Ms. Nelson what she called an orientation or goal plan.

  d. In March and April of 2012, Ms. Bland and Martin attempted to impose unfounded and ridiculous discipline on Ms. Nelson for "acting outside of her scope of practice" when Nelson told a nurse practitioner under her supervision to "follow her instincts," even though Ms. Nelson's job description specifically required her, as an RN and nurse manager, to supervise, lead, role model, coach, counsel, train, and motivate personnel.

  e. Because Ms. Bland had allowed on-going fraudulent activity with regard to time and expense reports, Ms. Nelson's insistence on ethical behavior "alienated" staff, as demonstrated in a document prepared by Ms. Bland, entitled "Documenting Karen's Behavior," which criticizes Ms. Nelson for: (i) "[d]ouble checking every line item on expense report," and (ii) "TPCs required to document their time on a spreadsheet," and which also notes that staff has been "[a]lienated over expense report." Ms. Nelson can produce that document.

    f. In June of 2012, Ms. Bland did a mid-year review of Ms. Nelson, a review not normally done for other similarly-situated employees, in which Ms. Bland found numerous alleged problems with Ms. Nelson's work, despite the fact that Ms. Nelson had met every goal listed in the orientation/goal document given to Nelson in February by Bland, generally ahead of time. Instead of incorporating objective work performance in the evaluation, Ms. Bland based her criticisms on the complaints of the same staff who had been alienated by Ms. Nelson's changes in reporting requirements.

    g. When Ms. Nelson refused to sign the mid-year review, Ms. Bland ordered Ms. Nelson out of the workplace; only to apologize and invite Ms. Nelson back the same day.

31. In August of 2012, Kaiser officials notified Ms. Nelson that her job was being eliminated so that Ms. Bland could be returned as the nurse manager and as the person reviewing time and expense reports.

32. Even after the lay-off was announced, Kaiser treated Ms. Nelson differently and less advantageously than similarly-situated employees who had not opposed discrimination, for example:

    a. Ms. Nelson applied for three other positions after being notified of her impending termination, but before the actual termination, all of which she was qualified for.

    b. Under Kaiser policy, transitional employee candidates are to be hired over other equally-qualified internal or external candidates and managers not following this policy must demonstrate in writing that another candidate "clearly possesses superior qualifications or experience."

    c.  Kaiser denied Ms. Nelson all positions for which she applied, (i) affirmatively cancelling another nurse manager position for which Ms. Nelson applied; and (ii) refusing to even interview her for the other two positions.

    d.  There is no indication that managers hiring for the three positions for which Ms. Nelson applied demonstrated in writing that another candidate "clearly possesses superior qualifications or experience," as required by Kaiser rules.

*Effects of Defendants' Actions*

  25.  As a result of Defendants' actions, Ms. Nelson suffered severe emotional and physical distress. Emotionally, Ms. Nelson suffered and continues to suffer, among other effects, feelings of being violated and victimized, anxiety, fear, anger, shame, humiliation, loss of enjoyment of life, depression, nightmares and insomnia. Physically, Ms. Nelson suffered and continues to suffer, among other effects, loss of sleep, nightmares, loss of appetite, nausea, weight loss, migraine headaches, bouts of anxiety, bouts of sobbing, interpersonal relationship problems, and loss of enjoyment of life.

  26.  Ms. Nelson has also suffered and continues to suffer economic damages from the actions of the Defendants, including, but not limited to medical costs, and the necessity of incurring substantial attorney's fees and costs.

## ADMINISTRATIVE PROCEEDINGS

  27.  Ms. Nelson filed a complaint with the Colorado Commission on Civil Rights ("CCRD") and the Equal Employment Opportunity Commission ("EEOC") on February 7, 2012, complaining of: (i) discrimination on the basis of race and national origin, and (ii) retaliation. She filed an amended complaint on January 10, 2013.

28.     The CCRD issued a decision and notice of right to sue on April 5, 2013, which was, according to the postmark, mailed on April 12, 2013, and received by Ms. Nelson on or about April 16, 2013.

## VIOLATIONS ALLEGED

29.     As to each of the following claims for relief, paragraphs 1 through 28 above are incorporated by reference and re-alleged as if fully set forth in each separate claim.

## FIRST CLAIM
### (WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY)

30.     Ms. Nelson was employed by Kaiser at all times relevant to the claims here;

31.     Kaiser discharged Ms. Nelson in November of 2012.

32.     Kaiser discharged Ms. Nelson because she refused to engage in fraud, especially fraud related to billing, time keeping and expense reimbursement, and attempted to stop fraud by reporting it to officials within management of Kaiser.

33.     Ms. Nelson's termination undermines a clearly expressed public policy in preventing fraud in the provision of healthcare, especially Medicaid fraud.

34.     In taking the actions described here, Kaiser engaged in wrongful termination in violation of public policy.

35.     In its actions, Kaiser acted intentionally, and in a willful and wanton manner, recklessly disregarding Ms. Nelson's rights.

36.     As a result of Kaiser's actions, Ms. Nelson suffered damages, including but not limited to those described above.

## SECOND CLAIM
### (Violation of Rights under 42 U.S.C. §2000e, *et seq*.-- Discrimination)

37. Kaiser took materially adverse actions against plaintiff Nelson, including, but not limited to the actions of:

    a. Subjecting Ms. Nelson to a hostile work environment because of her race and/or national origin; and

    b. Treating Ms. Nelson differently and less advantageously than similarly-situated non-Jamaican employees because of her race and/or national origin.

38. In taking the actions described here, Kaiser violated Ms. Nelson's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C §2000e, *et seq*., and, thus, is liable for damages caused her by the violation.

39. In its actions, Kaiser acted intentionally, and in a willful and wanton manner, recklessly disregarding Ms. Nelson's rights.

40. As a result of Kaiser's actions, Ms. Nelson suffered damages, including but not limited to those described above.

## THIRD CLAIM
### (Violation of Rights under 42 U.S.C. §2000e, *et seq.* -- Retaliation)

41. As described above, Ms. Nelson opposed discrimination at the Kaiser.

42. In retaliation for Ms. Nelson's opposition to discrimination, Kaiser took materially adverse actions against plaintiff Ms. Nelson, including, but not limited to the actions of:

    a. Subjecting Ms. Nelson to adverse working conditions different from those

enjoyed by other employees who did not oppose discrimination; and

      b.      Subjecting Ms. Nelson to a hostile work environment; and

      c.      Terminating Ms. Nelson's employment.

43.      In taking the actions described here, Kaiser violated Ms. Nelson's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C §2000e, *et seq.*, and, thus, is liable for damages caused her by the violation.

44.      In its actions, Kaiser acted intentionally, and in a willful and wanton manner, recklessly disregarding Ms. Nelson's rights.

45.      As a result of Kaiser's actions, Ms. Nelson suffered damages, including but not limited to those described above.

## FOURTH CLAIM
**(Violation of rights under 42 U.S.C. §1981**-- Discrimination**)**

46.      Kaiser took materially adverse actions against plaintiff Nelson, including, but not limited to the actions of:

      a.      Subjecting Ms. Nelson to a hostile work environment because of her race; and

      b.      Treating Ms. Nelson differently and less advantageously than similarly-situated non-black employees because of her race.

47.      In taking the actions described here, Kaiser violated Ms. Nelson's employment rights under 42 U.S.C §1981, and, thus, is liable for damages caused her by the violation.

48.      In its actions, Kaiser acted intentionally, and in a willful and wanton manner, recklessly disregarding Ms. Nelson's rights.

49. As a result of Kaiser's actions, Ms. Nelson suffered damages, including but not limited to those described above.

## FIFTH CLAIM
### (Violation of Rights under 42 U.S.C. §1981 -- Retaliation)

50. As described above, Ms. Nelson opposed discrimination at the Kaiser.

51. In retaliation for Ms. Nelson's opposition to discrimination, Kaiser took materially adverse actions against plaintiff Ms. Nelson, including, but not limited to the actions of:

    a. Subjecting Ms. Nelson to adverse working conditions different from those enjoyed by other employees who did not oppose discrimination; and

    b. Subjecting Ms. Nelson to a hostile work environment; and

    c. Terminating Ms. Nelson's employment.

52. In taking the actions described here, Kaiser violated Ms. Nelson's rights under 42 U.S.C §1981, and, thus, is liable for damages caused her by the violation.

53. In its actions, Kaiser acted intentionally, and in a willful and wanton manner, recklessly disregarding Ms. Nelson's rights.

54. As a result of Kaiser's actions, Ms. Nelson suffered damages, including but not limited to those described above.

## SIXTH CLAIM
### (VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. §3730(h))

55. Ms. Nelson was employed by Kaiser at all times relevant to the claims here;

56. Kaiser discharged Ms. Nelson in November of 2012.

57. Kaiser discharged Ms. Nelson because she refused to engage in fraud, especially fraud related to billing, time keeping and expense reimbursement, and attempted to stop fraud by reporting it to officials within management of Kaiser.

58. In taking the actions described here, Kaiser violated the anti-retaliation provisions of the False Claims Act, 31 U.S.C. §3730(h)..

59. In its actions, Kaiser acted intentionally, and in a willful and wanton manner, recklessly disregarding Ms. Nelson's rights.

60. As a result of Kaiser's actions, Ms. Nelson suffered damages, including but not limited to those described above.

## PRAYER FOR RELIEF

A. In view of all of the preceding, Ms. Nelson respectfully requests that this Court award, adjudge and decree that:

  (1) The conduct alleged is violative of federal and state law and of Ms. Nelson's rights thereunder;

  (2) In accordance with state and federal law,

   (a) Defendants pay to Ms. Nelson an amount – the exact total of which is presently undetermined – comprised of

    (I) The actual damages she has sustained and damages she will sustain in the future as a result of such violations, economic and emotional, and

    (II) Exemplary or punitive damages, as allowed under law;

   (b) Ms. Nelson be awarded her costs of suit, including reasonable

attorneys' fees and costs;

    (c)  Ms. Nelson be awarded interest on the above; and

B.  Ms. Nelson have such other, further and different relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury.

**Dated** this 11th day of July, 2013.

        Respectfully submitted:

        *s/Patricia S. Bangert*
        _____
        Patricia S. Bangert
        Attorney at Law, LLC
        3773 Cherry Creek North Drive, Suite 575
        Denver, Colorado 80209
        Phone: (303) 228-2175
        Fax: (303) 399-6480
        Email: pbangertlaw@aol.com
        **Attorney for Plaintiff**

<u>Address of Plaintiff</u>:
205 N. Sable Blvd, #5301
Aurora, CO 80011